Knowles, D. J.
The libel in this cause of collision was filed January 21, 1880, the answer February 11, and the cause brought to a hearing on the seventh of April following.
Upon the points of contention raised and discussed at the hearing I propose now to announce my conclusions, first stating the allegations and claims of the respective parties as set forth in the libel and the answers:
ALLEGATIONS IN THE LIBEL.
First. That your libellants, before and at the time of the collision, in the second article hereof mentioned, were the owners, and the said Lafayette Weaver was the master, of said schooner Mary Weaver, her tackle, apparel, and other furniture, which your libellants employed in the coastwise freighting business between different ports and places in the United States; that she was of 222 tons burden, as registered, with a carrying capacity of 350 tons; that she was duly enrolled and licensed for said business, and was actually employed therein at time of said collision, and was light, staunch, sound, fully equipped, and had the usual compliment of men and officers on board.
*812 Second. That on the fifteenth day of December, A. D. 1879, said schooner Mary Weaver sailed from Port Comfort, in the state of Virginia, with a valuable cargo of coal on board, bound for the port of Providence, in the state and district of Ehode Island, and that during said voyage, to-wit, about 11 o’clock p. m. of the seventeenth day of December, A. D. 1879, when in Long Island sound, off Saybrook, in the state of Connecticut, and about six miles southerly therefrom, and heading east by north, with the wind blowing an eight-knot breeze from a little west of north, and with her lights all as required by law, set and burning brightly, and the master and two of crew on the lookout for the protection and management of the vessel, the said master and crew descried at some distance ahead, to-wit, about half of a mile, and about one point on their starboard bow, a vessel which afterwards proved to be the schooner Onmst, aforesaid, approaching and heading about from west to north, to west by north-west, or thereabouts, and being on her starboard tack, and showing to those on the Mary Weaver her red light plainly. Whereupon, the master of said schooner Mary Weaver ordered the helm of his vessel put hard a-port, which was done, and thereby opened the lights of said Onmst fully five points to the windward or port, said Mary Weaver keeping her wheel hard a-port, when of a sudden the red light of the said Onmst was obscured to him and his crew, and her green light became visible; and although he kept his helm hard a-port as possible, and slackened his main peaks and tried to keep out of her way, yet the said Onmst continued to bear down on the weather or port side of the said Mary Weaver, and struck her on that side near her stern, cutting her down to within one streak of her water line, carrying away one corner of her house, and her wheel and wheel-post and attachments, and the stem-post and davit, and rail and attachment, and injuring and carrying down her boat, and doing much other damage to said schooner Mary Weaver.
Third. That said collision and damage were caused solely by the fault of the person having charge of and navigating said schooner Onmst, in not keeping her on the course she was sailing when the vessels descried and neared each other, *813 or in not porting her helm at that time, and in starboarding her helm after that time and before the collision, and not by any neglect, omission or fault on the part of said schooner Mary Weaver, her master or orew.
Fourth. That said collision so much injured said schooner Mary Weaver that she was in great danger of sinking, and her master, springing on board said Onmst, made fast a line to the capstan of said Onmst, informing the master of the Onmst of the critical condition of the Mary Weaver and her boat, and asking him to stay by and take off the crew of the Mary Weaver, in case it should become necessary so to do to Bave their lives, which the master of the Onmst promised to do till light; and when the master of the Mary Weaver returned to his own schooner he let go his largest anchor and 60 fathoms of chain, and an equal length of the line attached to the Onmst, set and kept his pumps agoing, and endeavored to fasten a piece of canvas over the breach in the side of and under his vessel, and endeavored in every way possible to keep his vessel afloat and save her, and continued thus engaged with his crew till about half-past 1 o’clock on the morning of the eighteenth of December, A. D. 1879, when the master of the Onmst, or some one on board of the Onmst, cut the line that had been attached to her as aforesaid, and the On-mat sailed off, though the wind was still high and the night bitterly cold, leaving the Mary Weaver and her master and crew to save themselves as best they could. The master and orew of the Mary Weaver, finding themselves left in this critical condition, set themselves to work to extrioate and repair their boat, which had been broken somewhat and driven under the side and stem of the schooner by the collision, and after great labor and suffering and danger succeeded in getting it out and fixing it so that it might possibly be used; and the wind soon after abating somewhat, the injured schooner did not make so much water as she had been doing, and the pumps, which had been kept in constant operation, kept her afloat till the next forenoon, when the New London freight boat came along and towed her into the harbor of New London, where she lay nine days making such *814 temporary repairs as were necessary to enable her to reach her port of destination, to-wit, the port of Providence, and discharge her cargo, which she did about the twenty-ninth day of December, 1879, and now lies in said last named port; and that the owners of said schooner Mary Weaver have and will sustain damages in consequence of said collision to the amount of $1,200.
Fifth. That the owners of said schooner Onmst are unknown to your libellants, and that her master and the vessel have not been seen by any of your libellants since she so sailed away; but they are informed and believe said schooner Onmst and her said master have just arrived, and now are in said port of Providence, and they so aver, and within the jurisdiction of this honorable court.
Sixth. That all and singular the premises are true, and within the admiralty and maritime jurisdiction of the United. States, and of this honorable court.
ALLEGATIONS IN THE ANSWER.
First. That said respondent is ignorant of the matters contained in the first and fifth articles of said libel; and as to the matters contained in the second, third and fourth he has no personal knowledge, but understands that the same are in great part falsely alleged, and that the truth is as hereinafter alleged.
Second. That the said schooner Onmst, being in good order, and well equipped and manned, was, on the night of the seventeenth day of December, 1879, between the hours of 11 and 12 p. m., sailing up Long Island sound, and about three miles east of Saybrook, with a strong breeze blowing from between N. W. and N. N. W., said schooner sailing close hauled on the starboard tack, with her port and starboard lights set and burning brightly, as required by law, with a competent man at the wheel, and the mate forward on the forecastle deck, on the lookout; that the red light of a vessel, which after-wards proved to be the Mary Weaver, was descried between one and two miles off, and about one point on the port bow; that after an interval of a few minutes — the Onmst in the *815 meantime keeping her course — the green light of the Mary Weaver suddenly came into view, and her red light was obscured. The Mary Weaver continued showing her green light, and the Onmst continued on her course until the latter had the former about three or four points on her starboard bow, and at a distance of about three or four lengths, and the two vessels were in such relative positions that if the Mary Weaver had then kept her course they would have easily gone well clear of each other. When in the position just described the red light of the Mary Weaver suddenly came into view and her green light was obscured, and almost immediately, on account of the relative speed of the two vessels, the Mary Weaver was across, or nearly across, the Onmst’s bows. The captain of the Onmst, seeing that a collision was inevitable, ported his helm and luffed up, in order to ease the blow as much as possible, and succeeded so far that, instead of striking the Mary Weaver a direct blow, either forward or amidships, which he would have done if he had starboarded his helm or kept his course, and have immediately sunk her, he struck her a partially glancing blow near the stern.
Third. That said collision was not caused by any negligence or carelessness, or breach of sailing rules, on the part of those on board the Onmst; but that, on the contrary, it was caused by the negligence and want of care, and the violation of the rules of navigation, and the dictates of ordinary prudence and good seamanship, on the part of those navigating the Mary Weaver — first, in starboarding her helm just after the vessels came in sight of each other, and secondly, in porting her helm in the manner and under the circumstances above described; that, had the Mary Weaver kept on the original course on which she was sailing when first seen, and which she ought to have done and could have done, she would have passed well to leeward of the Onmst.
Fourth. That after the collision had occurred the captain of the Onmst took a lantern and examined the hull of the Mary Weaver, and saw a hole in her side, but above the water line, so that there was no immediate danger of sinking on the part of ';he Mary Weaver. The captain of the Mary Weaver *816 was in a very excited condition, $nd kept calling, in a distracted way, to his men, to know if the pump sucked. At last one of them replied: “Yes, damn her, she sucks.” Just after the two vessels came together some one on board of the Mary Weaver jumped on board the Onmst with a bight of a line, and made it fast to the capstan of the Onmst. Another line was passed from the Onmst to the Mary Weaver. The captain of the Mary Weaver asked the captain of the Onmst to lie by him, which the latter consented to do for awhile, although not deeming the Mary Weaver in danger of sinking. The Onmst laid by the Mary Weaver for more than two hours, and, after staying this length of time, and after hearing from some one on her deck that the pump continued to suck, (indicating that she was free from water, and in no danger of sinking,) and also hearing that the Mary Weaver’s boat was in good condition, and the Long Island shore being only from a mile and a half to two miles distant, and the Onmst herself being in a crippled condition, having lost her head-gear and liable to lose her masts, the captain of the Onmst did not regard it that the dictates either of humanity or prudence required him to lie by any longer. In order to cast off it was necessary to cut the line, as it was so far turned around the capstan that any other method was impracticable.
Fifth. That all and singular the premises are true.
It is seen at a glance that one question, not to say the principal question, presented for inquiry and adjudication is,was the Onmst or the Mary Weaver the blameworthy vessel as regards the collision of the seventeenth of December? The libellants allege that the Onmst was in fault and the Mary Weaver innocent — the libellees alleging that the Mary Weaver was in fault and the Onmst innocent. As bearing upon this point, the sixteenth and seventeenth Eules of Navigation were cited and expounded by the parties, the discussion terminating in an agreement between them that, whichever of these rules governed the case at bar, it was the statutory duty of the Mary Weaver, under the circumstances in proof, to keep out of the way of the Onmst — that is, to turn and keep to the right. The questions at issue, then, became these: 1. Did *817 the Mary Weaver bear to the right, and keep on her course without change down to the moment of collision? 2. Did the Onmst keep on her course, without any culpable or material change, until a collision became inevitable? These are the agreed principal issues. As bearing upon them, many subordinate points or questions were raised and contested, having relation to the position of the two vessels when they first descried each other; the state of the wind and weather; the maneuverings of the vessels previous to the collision; the number and special occupations of the several persons on the decks of the two vessels at, before and after the collision; the state of the tide, and the importance or non-importance of it as a factor in estimating the speed of a vessel on or through the water; the relative speed of the two vessels; the time required to change the course of a vessel four or five points, under supposed circumstances; the non-production by the libellants of any deposition of the wheel-man of the Mary Weaver; the alleged impossibilities of the conflicting theories of the collision, each party branding as erroneous, or wilfully untrue, the other’s theory, and as deceptive and unreliable the plats or diagrams purporting to embody those theories; the alleged stealthy departure of the Onmst from the scene of the collision after the lapse of about two hours, her oaptain having promised to lay by the crippled Mary Weaver until daylight; the credibility and honesty, or the opposite, of the witnesses in mass, and singly, considered; the value of experts’ testimony in general, and especially the value of the testimony of the thirteen whose depositions were exhibited in evidence, to refrain from further enumerations.
Of the evidence submitted by the parties it seems sufficient here to say it was very voluminous, remarkably contradictory, and wholly irreconcilable. It was embodied in depositions, which were read, and in great part repeatedly reread, at the hearing, and was the subject of exhaustive comment by the learned, astute and zealous counsel of the parties. To that evidence and those comments I gave undivided attention, throughout a hearing prolonged almost beyond precedent— *818 not to say beyond reason — and since the hearing have given to them that second thought, which is the due of litigants, when to the court is submitted a case upon the facts as well as the law; and the conclusion to which I have arrived is that the libellants have failed to substantiate against the Onmst their charge as set forth in the second and third articles of their libel, and that I must pronounce for the Onmst, as regards those articles.
As regards the fourth article of the libel, relating to the abandonment of the Mary Weaver by the captain of the Onmst, shortly after the collision, but little needs be said in this connection. It was contended by the libellants that, upon the facts and the law, the court would be justified in regarding the abandonment as a quasi confession of guiltiness of the misdoing charged in articles second and third; that, as such, it is entitled to a prominent place among the facts put in proof on behalf of the libellants. In this view I cannot concur. The evidence, it cannot be questioned, convicts the captain of the Onmst of unseamanlike and unmanly, not to say inhuman, conduct on this occasion — conduct which, it is to be regretted, is not punishable under some penal statute of the United States; but that, in view of all the circumstances in proof, any considerable weight can be accorded it, as a confession or admission of guiltiness in the matter of the collision, is not to be conceded.
An order must be entered dismissing the libel, without costs for either party.